968 So.2d 475 (2006)
In the Matter of the ESTATE OF Clyde V. WOODFIELD, Deceased, and
In the Matter of the Conservatorship of Michael A. Woodfield.
John V. Woodfield, Appellant,
v.
Sharon McCoy Woodfield, Administratrix of the Estate of Clyde V. Woodfield, Deceased, and
Alfred R. Koenenn, Guardian Ad Litem and Temporary Conservator of Michael A. Woodfield, Appellees.
No. 2004-CA-00238-COA.
Court of Appeals of Mississippi.
November 21, 2006.
Rehearing Denied May 1, 2007.
*477 John Vernon Woodfield, Long Beach, attorney for appellant.
Timothy Lee Murr, Alfred R. Koenenn, Gulfport, attorneys for appellees.
EN BANC.
*478 SOUTHWICK, J., for the Court.

OPINION ON MOTION FOR REHEARING[1]
¶ 1. In this estate proceeding, all beneficiaries under a last will and testament written just before the testator's death agreed that it should not be probated. The chancellor later found the eve-of-death will to have been void. On appeal, certain decisions that flowed from the failure to probate are challenged. One of the challenged results was to probate and interpret a much older will. Other issues concern sanctions that were entered against the party who offered the recent will for probate, and the failure of the chancellor to recuse himself. We find no error except as to the award of attorneys' fees as a sanction. We reverse that award and remand for further proceedings.

FACTS
¶ 2. The testator, Clyde V. Woodfield, died on September 29, 2001 in Gulfport. He was survived by his wife, Sharon McCoy Woodfield, and two adult sons, John and Michael. In 1997, the younger son, Michael A. Woodfield, was in a motorcycle accident. He suffered a severe brain injury which rendered him a quadriplegic and totally incapacitated. The older son, John V. Woodfield, was appointed as conservator for his half-brother Michael shortly after the accident. John served as Michael's conservator until September 2002 when the court substituted Alfred Koenenn as a temporary conservator and as guardian ad litem.
¶ 3. Only three days before his death, Clyde Woodfield executed a will. On October 9, 2001, two weeks after the will was written, his widow Sharon Woodfield petitioned for probate of the 2001 will. Her initial attorney was her stepson, John Woodfield, who practices on the Mississippi Gulf Coast. The will was probated and Mrs. Woodfield was appointed as the executrix of the estate.
¶ 4. Apparently because of John Woodfield's legal practice, the chancellors of the Eighth Chancery Court District recused themselves from the case on February 19, 2002. After the initially-appointed special judge withdrew, the Supreme Court on April 11, 2002, appointed another former chancellor, William L. Griffin, Jr., to serve as a substitute special chancellor. We will usually refer to him simply as "the chancellor," though his service is only in this case.
¶ 5. Michael Woodfield's new guardian filed a petition contesting the 2001 will on October 21, 2002. The executrix, Sharon Woodfield, filed for probate of a last will and testament that was dated January 11, 1973, even though she had already been appointed under the 2001 will. The executrix later testified that she met her stepson, attorney John Woodfield, at the courthouse the day that the 2001 will was presented for probate. She stated that it was the 1973 will that she delivered to him at that time and only later found out that it was a different will that had been probated. She also denied even knowing the 2001 will existed until long after it was probated. Another lawyer represented the estate after the controversies arose regarding John Woodfield.
¶ 6. In ruling on motions before trial, the chancellor found that no one objected to *479 withdrawal of the 2001 will from probate. He therefore granted the motion to withdraw the will on March 18, 2003. Left open was the issue of sanctions against John Woodfield for having sought to probate the will. In the same pretrial order, the chancellor appointed Sharon Woodfield as Administratrix C.T.A. (cum testamento annexo, or with will annexed), under the 1973 will.
¶ 7. The parties agreed to a two-part trial. The first part, which started the day of the pretrial decisions on March 18, considered three issues. These were the chancellor's rulings: (1) the 2001 will, after being withdrawn as an instrument that could dispose of property, had no further effectiveness and therefore did not revoke all prior wills; (2) Clyde Woodfield did not die intestate; and (3) though the original of the 1973 last will and testament was not produced, that will was in effect after the withdrawal of the 2001 will and should be admitted to probate as his last will and testament. As a penalty for frivolous litigation by John Woodfield in offering the 2001 will for probate, the chancellor awarded fees to Sharon Woodfield's attorney in the amount of $22,155.78. Michael Woodfield's guardian and conservator was awarded $15,220.78 in fees and expenses. The order was filed on April 25, 2003.
¶ 8. On June 26, 2003, John Woodfield filed a motion seeking Chancellor Griffin's recusal, which the judge denied but also certified for interlocutory appeal. The sole basis for recusal was that Alfred Koenenn, the guardian for Michael Woodfield, had made a $500 contribution to Chancellor Griffin's unsuccessful 2002 election campaign. On September 5, 2003, a three-justice panel of the Supreme Court found that the chancellor "did not abuse his discretion in determining that a reasonable person knowing all the circumstances would not question his impartiality." After making that finding, the court denied John Woodfield's petition for interlocutory appeal.
¶ 9. On October 13, 2003, the second part of the trial commenced. The three issues presented to the chancellor were the testator's meaning in the clause in his 1973 will that referred to "[m]y homestead," which was devised to his wife, Sharon Jeanne McCoy Woodfield; whether to accept John Woodfield's testimony that his monetary debts to Clyde Woodfield had been forgiven prior to the latter's death; and the ownership of certain personal property, which is no longer an issue.
¶ 10. The chancellor ruled that the term "homestead" in the will encompassed a 324-acre farm. The estate was awarded $261,558.15 against John Woodfield for various debts owed his father. John Woodfield was also ordered to pay $7,710 in attorneys' fees owed by Michael Woodfield's guardian ad litem, and $7,500 in attorneys' fees owed by Sharon Woodfield.

DISCUSSION
¶ 11. Chancellors have broad discretion in their rulings regarding will contests. Their findings of fact will only be disturbed on appeal if they were manifestly wrong, there was an abuse of discretion, or an erroneous legal standard was applied. Estate of Grantham v. Roberts, 609 So.2d 1220, 1223 (Miss.1992). We will affirm unless we are "left with the firm and definite view that a mistake has been made." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1264 (Miss.1987).
1. Voiding of the 2001 Last Will and Testament
¶ 12. As discussed in our description of the trial court proceedings, prior to the March 18, 2003 commencement of trial, John Woodfield had withdrawn his petition for probate of the 2001 last will and testament. *480 In a written pretrial order, entered nunc pro tunc after trial, the judge said he received "no objection from any party in interest or any heir at law of the decedent" to the abandoning of probate of the 2001 will, and consequently the motion to withdraw the will was granted. By the time of the trial, the only will potentially to be probated was the one executed in 1973. We note that the only substantive difference between the two wills is that in the earlier will, both of the testator's sons shared equally in certain property. In the later will the disabled brother received no property. There was evidence that the testator-father explained the change by saying he expected his wife and attorney son to look after his other son.
¶ 13. During the first phase of trial, there was evidence that John Woodfield was absent when his father came to his office to have the 1973 will revised. There was testimony that John had for some time encouraged his father to remove Michael from the will. Nick Thornton, a paralegal, testified that although he had not worked for John Woodfield full-time since June of 2000, he occasionally visited the office to use the computer and provide limited assistance. Thornton said that he prepared the will after Clyde Woodfield gave him a copy of the 1973 will and told him to delete all references to Michael. Thornton testified that he asked why Michael was being removed from the will, and Woodfield responded that he did not want the government seizing farm assets that under the 1973 will would be given to Michael. Clyde was certain his wife and his other son John would take care of Michael's needs. There also was evidence that John Woodfield told his counsel after disputes over probate arose that John believed the 2001 will was "tainted" and should be withdrawn.
¶ 14. The chancellor in his judgment after the first stage of trial found that John Woodfield had breached his fiduciary duty to his half-brother Michael, for whom he had been serving as conservator, when he allowed Michael's benefits under the 1973 will to be deleted. The chancellor found the 2001 will "more than `tainted.'" The chancellor "specifically finds that pursuant to [In Re Estate of Smith], 827 So.2d 673 (Miss.2002), that the Last Will and Testament of Clyde Woodfield, dated September 26, 2001, is void due to a breach of confidential relationship and a breach of fiduciary duty of John V. Woodfield." That finding is in response to the question posed in the same paragraph of the judgment, namely, "whether or not the September 26, 2001 `document' survived as an instrument of revocation and therefore revoked all prior Last Wills and Testaments of the decedent." The chancellor held that when John Woodfield withdrew the 2001 will from probate, it "was a withdrawal for all purposes" in part due to his finding of the breach of fiduciary duty.
¶ 15. On appeal, John Woodfield presents five different arguments as to why it was error to find that the 2001 will was void and not to apply intestacy rules. The result of the chancellor's supposed error was that it caused the "other issues as alleged by the Guardian Ad Litem" not to be addressed. We are not certain just what issues John Woodfield is referencing. His appellate brief summarizes that "all of the above Petitions filed by the Guardian Ad Litem essentially raise the issue of devisavit vel non contesting the validity of the September 26, 2001, Will. . . ." As defined by eminent authority, this Latin phrase refers to the legal document used by a chancery court "to try the validity of a paper asserted and denied to be a will, to ascertain whether or not the testator did devise, or whether or not that paper was his will." BLACK'S LAW DICT. (6th ed.1990), *481 at 452; see Miss.Code Ann. § 91-7-29 (Rev.2004) (estate statute regarding "trial of issue devisavit vel non").
¶ 16. We accept that the appellate issue posed by John Woodfield is whether the chancellor erred in failing to hold that the 2001 will irreversibly revoked the 1973 will and that Clyde Woodfield in effect died intestate. John Woodfield's 2003 motion to withdraw the 2001 will from probate noted that the will had been contested on various grounds. In the motion, John denied wrongdoing but said "it is in his best interests as well as the best interests of the Estate itself" that the 2001 will be withdrawn. The motion also stated John Woodfield did not concede the validity of the 1973 will that his stepmother had offered for probate. We might interpret differently the precedent on which the chancellor relied, In Re Smith, in holding the 2001 will to be void. However, we need not explore In re Smith if we first conclude that withdrawing the will from probate, whether the will was defective or not, was valid and blocked the language of revocation from having any effect.
¶ 17. There is not much appellate court precedent regarding the refusal to probate a will. One well-reasoned and dated opinion by Justice George Ethridge recognized that all parties with an interest in an estate could refuse to offer a will for probate and agree to a different disposition. Parker v. Broadus, 128 Miss. 699, 91 So. 394 (1922). The appellant, who was the executor and not a beneficiary, argued in his brief that probate was mandatory:
If it was proper for [the testator] to want two of his children to receive the property and to want eight of them not to participate in it as his property, and having, as he did, left a last will and testament, then we have no hesitancy in urging upon this court the fact that the devisees in the will [must] be required to take under the will and not otherwise.
Broadus, 128 Miss. at 700, 91 So. 394. The only two children who received property in the will agreed not to probate and instead to share the estate with their siblings. The Supreme Court held that though a testator may dispose of his property in any manner, the beneficiaries also may "renounce the will where it contains no trust or other limitation upon the property devised or bequeathed by the will. . . ." Id., 128 Miss. at 707, 91 So. at 395. Particularly relevant for the issue before us today, once the will is renounced by all interested parties, "the effect of the renunciation relates back to the time the will became effective so as to make it void where, as in this case, the property [in the renounced will] is devised unconditionally and absolutely to the beneficiaries." Id.
¶ 18. If the agreement to renounce be "entirely free from fraud, and is made by all the parties in interest," then the agreement is valid. Id. The chancellor in Broadus, V.A. Griffith, who would later serve twenty years on the Supreme Court, was quoted in the opinion:
It is difficult to perceive why the valid wishes of one of the dead should be more obligatory upon us than the equally valid, and in this case more generous, wishes of all the living. A testator may confer by will upon an heir a larger share of his estate than the law would give, but the testator possesses no potentiality to compel the heir to accept it, nor may the court do so for him. There could be no policy of the law, or public welfare or of public interest that could rise above that which would conserve and insure harmony, peace, and good will among the living members of a numerous family. The family settlement here is fair, equitable, and commendable from every standpoint of refinement of *482 feeling and of unselfishness of affection, and it ought to stand.
Id., 128 Miss. at 708, 91 So. at 395. The wishes of the living took priority even over a letter left by the testator insisting that most of his children receive nothing. Id., 128 Miss. at 705, 91 So. at 394.
¶ 19. A pre-eminent scholarly authority on Mississippi law wills and estates law cited Broadus as sole support for the conclusion that "no one has a legal duty to probate a will. If all of the parties in interest are competent and do consent, they may agree not to probate a will but administer the estate as if the decedent died intestate." ROBERT WEEMS, WILLS & ADMIN. OF ESTATES IN MISS. § 7.17 (3d ed.2003), at 175. Professor Weems mentions intestacy as the result of such an agreement. Indeed, that might be the usual agreement. Yet Broadus stands for the proposition that equitable agreements among beneficiaries may be enforced. Intestate distribution is not the only agreement that beneficiaries may make, nor was it the Broadus agreement.
¶ 20. We examine Broadus more closely to determine just what it does command.
Though in some jurisdictions an agreement to dispense with the probate of a will has been declared to be against public policy and void, in a majority of the decisions on the point it has been held that all the persons interested in a decedent's estate may by agreement divide the estate among themselves, without probating such decedent's will or administering the estate, and the validity of a contract having for its sole purpose the disposition of property in a manner different from that proposed by a testator, even where the contract contemplates the rejection of the will when offered for probate or its setting aside when admitted to probate, when it is entirely free from fraud, and is made by all the parties in interest, would seem to be freely conceded. Thus it has been held that all the parties in interest may agree to eliminate from a will a clause providing for survivorship among them. But an agreement to resist the probate of a will and procure it to be set aside so as to cut off the interest of one who is not a party to such agreement is against public policy. Nor does the right of all the parties in interest to set aside or disregard a will extend to the case of an active trust, for a definite term, created by a testator as he deems proper for the protection of his beneficiaries.
Broadus, 128 Miss. at 707-8, 91 So. at 395 (quoting 28 R.C.L. Wills § 359 (1929), at 357-58).
¶ 21. This quote does not state that property must descend by the rules of intestacy once a will is withdrawn from probate. Instead, the legal principle is that when everyone with an interest in a decedent's estate have agreed not to probate a will and instead to dispose the "property in a manner different from that proposed by a testator," the enforcement of that agreement "would seem to be freely conceded." Id. In Broadus, there was not an earlier last will and testament that was offered for probate after renouncing of the disfavored will. There was, though, an agreement that went beyond substituting the effect of intestate descent and distribution. An equal distribution among all ten children was agreed but then adjusted for advancements made by their father during his lifetime to individual children. Id, 128 Miss. at 706, 91 So. at 394. In the present appeal there was no contract regarding a new disposition. Instead, in the estate proceedings there were pleadings and perhaps orally expressed agreements that the 2001 will should be withdrawn. No agreement was reached on the final *483 disposition of Clyde Woodfield's property. We have two choices. One is to interpret Broadus as not permitting agreements to refuse the probate of a will unless a definite alternative disposition is also agreed. The other option is to consider the issues of refusing to probate and the precise substitute disposition as independent.
¶ 22. Assistance in making that choice might come from a closer examination of the only authority on which Broadus relied. The Ruling Case Law encyclopedia it cited does not contain any useful summary of the point beyond the lengthy quotation we have already given. 28 R.C.L. Wills § 359, at 357-58. That section of the encyclopedia refers to case annotations as its principal authority. Id., 358 nn. 13 & 14. More recent annotations were cited in the last-issued supplement to this R.C.L. volume. 28 R.C.L. Wills § 359 (1942), nn. 13 & 13a. One annotation discussed enforcement of agreements in "cases where there was no contemplated . . . attack upon the will." Annotation, Validity of Agreement among Beneficiaries for Distribution in Manner or Proportions Other than that Provided by Will, 97 A.L.R. 468, 469 (1935) (citing Broadus). That annotation cited an earlier one that collected "cases of disagreement among devisees and legatees over the validity or construction of a will," in which courts applied the right of litigants to settle disputes. Annotation, Right to Settle or Compromise Will Contest, and Validity of Agreement to Induce Others to Do So, 81 A.L.R. 1187, 1188 (1932) (citing Broadus). Though no dispute over a will's validity existed in Broadus, its result was consistent with the general principle that litigants have the right to settle their controversies. The living may agree to avoid a potential dispute left behind by the dead.
¶ 23. The Woodfields consented to settle a dispute by withdrawing the 2001 will. The fact that the parties did not agree as to what happened next does not invalidate the consent. We do not address John Woodfield's challenge to the chancellor's application of precedents regarding undue influence and breach of fiduciary duty. Those arguments are irrelevant because of the agreement not to probate the 2001 will. By withdrawing the will, the need for a decision on its validity was avoided. The decision still needed was on the effect of the valid withdrawal of that will. The chancellor found that the earlier will could be probated once the later will was no longer in issue. We turn to a review of the propriety of probating the 1973 will.
2. Probate of 1973 last will and testament
¶ 24. John Woodfield alleges that the 1973 instrument was a "lost will," and the requirements of proving the effectiveness of such a will were not met. The original of the will could not be located at the time of trial. Four factors comprise the analysis for probate of a will that has been lost:
(1) the proof of the existence of the will; (2) evidence of its loss or destruction; and (3) proof of its contents. A fourth element has been added: (4) that the testator did not destroy the will with the intent to revoke it. This last element arose from the theory that when a will cannot be found following the death of a testator and it can be shown that the testator was the last person in possession of the will, there arises a rebuttable presumption of revocation.
Estate of Cannon, 733 So.2d 245, 249 (Miss.1999) (citations omitted). The trial judge found clear and convincing evidence supporting probate of the 1973 last will and testament.
¶ 25. At trial, the attorney who drafted the 1973 will testified about proper execution. *484 There was evidence of testamentary capacity in 1973. The only contested lostwill issue in this litigation is whether the testator irretrievably revoked his earlier will. The widow Sharon Woodfield testified she gave the original will to John Woodfield to probate, but it was not produced at trial. Since there was evidence that the original still existed after the testator's death, any presumption that the testator destroyed it was rebutted. A copy of the 1973 will was accepted into evidence.
¶ 26. Though there is little evidence to support that Clyde Woodfield destroyed the 1973 will, there certainly is evidence that in 2001 he wished to revoke previous wills and adopt a new one. The dissent argues that the 1973 will was revoked by the 2001 will and could not be revived. An analogy is made that when a testator revokes his latest will, he does not intend to revive previous wills. The analogy is not an apt one. The Broadus-approved refusal to probate a deceased's last will is quite likely contrary to testator intent. We are not searching for the testator's factual intent but for what legally replaces intent. By executing a will in 2001, Woodfield was rejecting intestacy with at least as much clarity as he was rejecting his 1973 will. The Broadus court stated, in words that cover testate and intestate situations, that "the renunciation relates back to the time the will became effective" and the will is effectively "void." Broadus, 128 Miss. at 707, 91 So. at 395. This holding means that the disposition of the estate is as it would have been the day before the withdrawn will was executed. The dissent is correct that in Broadus there was no prior will. Still, that court chose to say that the will was "void," not just withdrawn. The act of its execution is canceled, making all terms of the will void by the beneficiaries' enforceable agreement not to probate.
¶ 27. We could review whether the 2001 will was always void and never validly expressed testator intent because of undue influence or a breach of fiduciary duty. A decision that it was void might create some comfort that the 1973 will better reflected the deceased's intent near the end of his life than did intestacy. Still, whether the 2001 was ever effective is tangential to the controlling law pronounced in Broadus. Simply put, the beneficiaries may refuse to probate the final will, a right not based on the will's potential defects. Once that is done, testator intent is lost. The dispute about the validity of the 2001 will was not necessary for the decision to withdraw it from probate, but that dispute strengthens the chancellor's finding that the 1973 will could be probated.
¶ 28. Regarding equities, we note that the 1973 will was likely closer to testator intent than was intestacy. The only difference between the two last wills was in the dispositions to the testator's two sons. In the 1973 will, certain bequests and devises were made equally to the sons. In the 2001 will, John Woodfield was the sole beneficiary of those provisions. The significant provision that the "homestead" would be owned solely by Clyde Woodfield's widow and not also by the two sons, was the same in the two wills. It is also important that the beneficiaries were aware of both last wills and testaments when deciding not to probate the 2001 will. There was no collusion whereby a beneficiary or the chancellor was never informed about one of the wills.
¶ 29. By withdrawing the 2001 will, the parties reached a compromise of a dispute in this case. Had they not done so, the chancellor's resolution of the validity of the 2001 will would have been subject to appellate review. The parties' agreement moots such review if the agreement was validly entered. The compromise was accepted *485 by the chancellor and is affirmed on appeal.
¶ 30. Our best choice about how to proceed once the last will is withdrawn by all beneficiaries is where the Supreme Court directs us. The cancellation "relates back to the time the will became effective so as to make it void," a statement that may be broader than the facts of the opinion in which it appears but persuasive all the same. Broadus, 128 Miss. at 707, 91 So. at 395. The 2001 language revoking all prior wills never came into effect. Equity might on some facts require substitution of intestate disposition for a withdrawn will. It was proper to hold on the facts of this case, though, that the 1973 will should be considered as containing enforceable testamentary disposition once all agreed that the later will was too tainted for probate.
3. Interpretation of 1973 will's reference to "my homestead"
¶ 31. The 1973 will devised Clyde Woodfield's "homestead and all of the furniture, fixtures and appliances located therein to my wife, Sharon Jeanne McCoy Woodfield." The remainder of the testator's real property was left in equal shares to his two sons, John and Michael. The chancellor determined that the entire 324 acres of the "Woodfield Farm" was devised by this provision. Since the 1973 and the 2001 last will and testament each had this provision, perhaps the most significant effect of a finding of intestacy would have been to alter the devise of this farm.
¶ 32. The chancellor found that this provision was ambiguous. Substantial parol evidence was admitted to explain its meaning. John Woodfield argued that the provision referred to a three-acre parcel that Clyde and Sharon Woodfield owned as tenants by the entireties with right of survivorship. That tract would have become the surviving owner's property by operation of law at the death of the other regardless of language in the will. John Woodfield also argued that an eighty-acre parcel on the north side of Woodfield Farms would have been included within the will language.
¶ 33. The chancellor rejected these arguments. Among the several items of evidence relied upon in the chancellor's finding was that all the Woodfield Farm tracts were contiguous and fenced. The family home was within this tract. The land had been used by Clyde and Sharon Woodfield regularly for family activities and was treated during the testator's lifetime as a unit. In the ambiguity of this provision, there was substantial flexibility for the chancellor's fact-findings. Technical legal meanings were unimportant, such as determining what the spouses had claimed or legally could claim for ad valorem tax purposes. Discerning the testator's intent as to what he wished to leave for his wife's enjoyment after his death was key. We find no error in the determination that the entire Woodfield Farm was intended to be left to Sharon Woodfield.
4. John Woodfield's debts to the estate
¶ 34. The chancellor ordered John Woodfield to pay substantial sums to the estate for debts that had been incurred through the years prior to the father's death. John Woodfield testified that some debts had been repaid and others forgiven, but his testimony was the principal evidence of that. Certain documents not produced during discovery were offered at trial, but they were unconvincing.
¶ 35. John Woodfield conceded that he owed $50,000 because a certificate of deposit titled in his father's name was seized by a bank as security for a loan to the son that was in default. The total awarded by the chancellor, though, was over $260,000. The largest single item was a $90,000 *486 promissory note from John to Clyde Woodfield, which the chancellor found was in default despite John's argument that the loan had been forgiven. The principal plus interest, late fees and attorneys' fees for collection being pursued by a Louisiana law firm, brought the total to about $144,000. There were other individual loans made by father to son which comprised the remainder of the total debt.
¶ 36. Substantial evidence supported that these debts were outstanding and they were properly found to be John Woodfield's continuing obligation after his father's death.
5. Attorneys' fees
¶ 37. John Woodfield alleges that the chancellor erred in concluding "that somehow the withdrawal of the 2001 Will from probate by the Appellant created some obligation to pay the attorneys fees of all parties." He argues that the withdrawal likely saved every attorney time and expense. The appellate brief does not point us to a specific court order or an amount that constitutes the award. He summarized by saying it was error to award "over $40,000" of attorneys' fees.
¶ 38. To give the argument its due, we have examined the various orders and judgments to determine the source and explanation of the awards. In the order of April 25, 2003, which followed the first phase of the trial on March 18-21, the chancellor determined that Rule of Civil Procedure 11 sanctions should be imposed on John Woodfield for these reasons:
due to the untimely withdrawal of the September 26, 2001 Last Will and Testament of Clyde V. Woodfield, when John A. Woodfield had previously been notified of the Petition to Contest the Will as early as July 11, 2002 by the Guardian Ad Litem. The Court finds that John V. Woodfield proceeded to be a proponent of the Will until thirteen (13) days before trial on March 18, 2003, which caused all parties and their counsel to spend unnecessary legal and expert costs during the period John V. Woodfield knew the Will was "Tainted." Further, the Conservatorship of Michael A. Woodfield was required to expend funds from its own account to defend a cause created and prosecuted, both actively and passively, by the very fiduciary whom was statutorily charged to protect the Ward's interests.
One part of the sanction was Sharon Woodfield's legal fees of $22,155.78, plus eight percent interest. Michael Woodfield's temporary conservator and the conservator's counsel were awarded a total of $15,220.78, plus interest in fees and expenses. This would appear to be the basis of John Woodfield's complaint concerning approximately $40,000 in sanctions.
¶ 39. There is evidence that John Woodfield admitted that the 2001 will prepared by his former paralegal, removing his half-brother Michael from any distribution, was suspicious no matter what the justification might have been. John Woodfield stated that he decided not to "get everything under the 2001 will" and "to throw that will out; it may be tainted. That I certainly don't want to even create an appearance of impropriety." John Woodfield did not concede that there was no justification for the new will. There was evidence that he encouraged his father after Michael's severe injury to revise the will, but that hardly falls to the level of punishable conduct. The testator was quoted as saying that due to Michael's profound handicaps, he wanted to keep him from gaining substantial property that some government agency might claim such as to offset costs of care.
*487 ¶ 40. Sanctions such as attorneys' fees under Rule 11 are a matter for the sound exercise of the trial judge's discretion. Eatman v. City of Moss Point, 809 So.2d 591, 593 (Miss.2000). The chancellor had been presented with an itemization of the legal fees of the parties to whom this award was given. What was awarded was the entirety of the fees, whether connected to any issues regarding the 2001 will or just to the more general issues of the estate. The chancellor did not address the validity of the charges when adopting without comment the amount of the fees that had been presented.
¶ 41. We note that in the final judgment of November 24, 2003, the chancellor awarded additional fees of $7,710 to the attorney for the conservator and $7,500 to Sharon Woodfield's attorney, "not as sanctions, but as an equitable matter considering the litigation of this matter as outlined above." We do not find that John Woodfield disputes those fees, and he has focused us solely on the earlier order of $40,000 imposed as sanctions.
¶ 42. The chancellor's failure to differentiate between fees resulting from issues regarding the 2001 will and those generated by representation on other legal matters arising in the estate was error. There was considerable dispute between the parties that went beyond issues surrounding the 2001 will, and of course those differences have continued until today and perhaps beyond. Insofar as a portion of the fees resulted from a defense against the effort to probate the 2001 will, we must find that there was a basis to award them as a penalty. Under M.R.C.P. Rule 11(b), the court may award reasonable expenses and attorneys' fees against a party or his attorney, or both, whose pleading or motion is frivolous or filed for the purpose of harassment or delay. A pleading "is frivolous within the meaning of Rule 11 only when, objectively speaking, the pleader or movant has no hope of success." Tricon Metals & Servs., Inc. v. Topp, 537 So.2d 1331, 1336 (Miss.1989). Ultimately, the chancellor had to find as a matter of fact that John Woodfield's actions in presenting the 2001 will were misconduct. We conclude that it was within his discretion based on the facts before him to determine that some of John Woodfield's actions were frivolous or for the purpose of delay. But not all of what John Woodfield did prior to the March 2003 trial can be categorized that way. We have noted the reasons we do not need to decide whether the 2001 will was void. We conclude, however, that offering for probate a will drafted for the deceased not long before his death and for which little involvement by John Woodfield has been shown does not appear totally frivolous.
¶ 43. There is insufficient evidence to support that all these fees should be awarded as a penalty. We reverse the award and remand so that another review of the fees will be made, and a decision reached concerning what fees, if any, should be considered a valid sanction. At the least, fees that resulted from representing a party on issues besides the validity of the 2001 will should be removed from the penalty. More basic, another review of the asserted misconduct is needed.
6. Chancellor's examination of Woodfield Farms property without a court reporter
¶ 44. John Woodfield argues that the chancellor improperly toured Woodfield Farms without a court reporter. During the tour, the chancellor engaged in discussions with Sharon Woodfield and with others. Chancellor Griffin later made a statement on the record that he, the attorneys *488 for John and Sharon Woodfield, and the temporary conservator Koennan toured Woodfield Farms together, and that he did so with the consent of the attorneys. John Woodfield concedes that the tour was without objection, but he argues that the chancellor should not have engaged in conversations. We find, though, that the parties consented to the tour and could have requested a court reporter.
¶ 45. If there was a desire to create a record of the event, there was a means to do so:
If no stenographic report or transcript of all or part of the evidence or proceedings is available, the appellant may prepare a statement of the evidence or proceedings from the best available means, including recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal. . . .
M.R.A.P. Rule 10(c). This option was not utilized. We will not speculate as to the conversations.
7. Recusal of Chancellor
¶ 46. John Woodfield argues on this appeal that the chancellor should have recused himself. As noted, the chancellor had authorized an interlocutory appeal on that issue between the first and second phases of the trial in 2003. A three-justice panel of the Supreme Court looked at the allegations of a disqualifying $500 campaign contribution by one of the attorneys to the chancellor, and found the argument to be without merit. The interlocutory appeal was dismissed, but we are bound by the ruling that appears in the order of dismissal on the insubstantial nature of the allegation.
¶ 47. We are not bound, though, to ignore evidence of later events that might require recusal. John Woodfield argues here that there was more than the improper donation. In his view, the fact that the chancellor who "admitted the will to probate resigned from office during the pendency of this case and joined the firm representing the other side also raised reasonable questions." In addition, the brother of the partner of Sharon Woodfield's attorney is the chancellor's close and long-time friend. The chancellor and the friend also may have lunched together during one of the trials in this suit. Nothing in these claims required recusal. The 2002 campaign contribution made by the conservator to Judge Griffin was termed by the Supreme Court an insufficient basis for recusal, and we adopt that holding. The other issues of friendships between chancellor and certain lawyers are not sufficient grounds for mandatory recusal.
¶ 48. John Woodfield does not explicitly argue on appeal that the chancellor's findings and conclusions revealed bias. The chancellor found that John Woodfield had "breached his fiduciary duty to Michael, his half-brother and Ward, and that this action is an unforgivable breach of justice to Michael." Other significant findings of fact were against John Woodfield. The chancellor found that John Woodfield at times was not truthful, such as about his father's forgiveness of debts. Judges must deal with the facts as they appear, and the resulting decisions occasionally can criticize a party or an attorney's conduct. The chancellor did not go beyond his role in fairly examining the evidence and reaching the conclusions that in his view were directed by that evidence.
¶ 49. There was no error in the chancellor's refusal to recuse himself.
¶ 50. We affirm the judgment except on the issue of the sanctions imposed on John Woodfield. That issue is remanded for further proceedings.
*489 ¶ 51. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED EXCEPT AS TO THE AWARD OF ATTORNEYS' FEES OF $22,155.78 AND OF $15,220.78, PLUS INTEREST. THE PORTION OF THE JUDGMENT AWARDING THOSE FEES IS REVERSED AND THE CAUSE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TWO-THIRDS TO THE APPELLANT AND ONE-THIRD TO THE APPELLEES.
KING, C.J., GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. LEE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., AND BARNES, J. IRVING AND CHANDLER, JJ., NOT PARTICIPATING.
LEE, P.J., Concurring in part, Dissenting in part:
¶ 52. The majority reverses and remands for that portion of the judgment awarding Sharon Woodfield legal fees of $22,155.78, plus eight percent interest, and the award to Michael Woodfield's temporary conservator and the conservator's counsel of $15,220.78, plus interest in fees and expenses, with which I concur. Due to the practical implications of the remainder of the majority's opinion, however, I must respectfully dissent. This Court's holding that the withdrawal of a will from probate withdraws the will for all purposes may result, as it did in this case, in a prior will being revived that the testator clearly intended to revoke.
¶ 53. "[I]n the absence of countervailing evidence, a man in possession of his faculties, must be presumed to have intended to do what he did do." Livelar v. Arnold, 233 So.2d 760, 763 (Miss.1970). Clyde Woodfield's clear intent was that the 2001 will replace the 1973 will. This Court's holding ignores his intent to revoke the 1973 will, whether the 2001 will is found to be effective or not. Clyde left this earth thinking that his affairs were in order and that his wishes would be carried out as specified in his 2001 will. Little did he know that the will that he assumed he revoked would come back as valid.
¶ 54. A testator desiring to revoke a will has two options: the testator may destroy, cancel, or obliterate the will or cause it to be done in his or her presence, or the testator may revoke the will "by subsequent will, codicil, or declaration, in writing, made and executed." Miss.Code Ann. § 91-5-3 (Rev.2004). The intent to revoke is essential to a revocation by act of the testator. McCormack v. Warren, 228 Miss. 617, 628, 89 So.2d 702, 706 (1956). Robert Weems in his treatise on wills and estates points out the following:
Two very important rules of Mississippi law should be noted with regard to a revocation clause. First, it is effective to revoke prior wills as soon as the instrument which contains the clause is validly executed. Even though a will in general is ambulatory and not effective until the testator's death, this is not true of the revocation clause. The most important consequence of this rule is that the revocation of the subsequent writing would not operate to revive the will it revoked. Second, a clear, unequivocal statement of revocation in the validly executed subsequent writing is conclusive on the matter of the testator's intent to revoke the prior will.
Robert A. Weems, WILLS & ADMIN. OF ESTATES IN MISS. § 5:3 (3d ed.2003) (footnotes omitted) (emphasis added). A revocation clause is a valid way to revoke a prior will. It cannot be assumed that if a testator wants a will revoked he will physically *490 destroy it. In many cases this may be impossible as the original will may be misplaced or with an attorney or friend who no longer can be found. It may be argued that the language in the revocation clause of the will is boilerplate, and I am well aware that a will may revoke a previous will without an express statement of revocation. Regardless, when the testator goes through the effort of making sure explicit language revoking all previous wills and codicils is in the will then that language should not be ignored.
¶ 55. Clyde's intent to revoke the 1973 will was evidenced by the first paragraph of the 2001 will in which he declared "this to be my Last Will and Testament, hereby revoking all previous wills and codicles [sic]." Parol evidence also existed to support Clyde's desire to revoke the 1973 will. For example, Nick Thornton, John's paralegal, and Danny Leggett, Clyde's friend who served as a witness to the will, both testified that Clyde stated his reason for wanting to remove Michael from the will was to keep the government from seizing farm assets that would be given to Michael under the 1973 will. Thornton and Leggett also testified that Clyde stated that he was certain that John and Sharon would take care of Michael.
¶ 56. The majority holds that "withdrawing the will from probate, whether the will was defective or not, was valid and would block the language of revocation from having any effect." The majority cites Parker v. Broadus, 128 Miss. 699, 91 So. 394 (1922), to support this holding. In Broadus, the deceased left all of his property to his two sons, to be owned and held or divided equally between them. As for his other eight children, the will provided that Broadus had "already deeded and conveyed to [his] other sons and daughters a great portion of [his] estate, both real and personal." Id. at 704, 91 So. at 394. Attached to the will was a letter explaining why he did not want to leave the other children an inheritance. Id. Upon Broadus's death, the two sons named in the will agreed to renounce the will and divide the property equally among the children, taking into account advancements made by their father during his life. Id. at 706, 91 So. at 394. The issue presented for review by the supreme court was "whether a family settlement entered into between parties all competent to agree, including all the beneficiaries of the will, can dispense with the probation of the will and renounce the will so as to make it ineffective as such." Id., 91 So. at 395. While a testator has the right to dispose of his property in the manner he desires, the supreme court, quoting the chancellor, stated that "[i]t is difficult to perceive why the valid wishes of one of the dead should be more obligatory upon us than the equally valid, and in this case more generous, wishes of all the living." Id. at 708, 91 So. at 395.
¶ 57. The majority's reliance on Broadus is misplaced as the facts in the Woodfields' case are distinguishable. Clyde's will contained a provision revoking all previous wills and codicils. Broadus's will did not contain such a provision as there was no need for one since no earlier will existed. The majority relies on the following statement in Broadus for its holding: "when a will is renounced the effect of the renunciation relates back to the time the will became effective so as to make it void where, as in this case, the property is devised unconditionally and absolutely to the beneficiaries." Id. at 707, 91 So. at 395. In my opinion, this statement in Broadus was only meant to apply in situations where no previous will existed.
¶ 58. Broadus stands for the proposition that those entitled to receive under a will, through agreement and absent a trust or other limitation, can decline to probate *491 and receive as though the testator died intestate. The headnote correctly surmises the rule from Broadus that when beneficiaries properly "repudiate the will and enter into an agreement with the heirs in a family settlement, the renunciation relates back to the date of the death, and such will will not be probated, and administration may be had as in case of intestacy." Id. at 699, 91 So. at 394. In discussing Broadus, Weems stated that "[i]f all of the parties in interest are competent and do consent, they may agree not to probate a will but to administer the estate as if the decedent died intestate." WILLS & ADMIN. OF ESTATES IN MISS. § 7:17 (emphasis added). Therefore, when Clyde's beneficiaries agreed to renounce his will the result should have been that his estate be distributed as if he died intestate. It is not logical to interpret Broadus to say that the beneficiaries of a will have the ability to renounce the will and reinstate a previous will that was obviously intended to be revoked by the deceased. The majority of this Court even states in discussing Clyde's intent that "there is fairly convincing proof that he wished to revoke by replacing with a new one." This Court must keep in mind that a testator has the right "to make such disposition not prohibited by law as may suit his purpose." Id. at 699, 91 So. at 394.
¶ 59. I do not disagree with the well-settled law in Mississippi that the beneficiaries of a will may renounce their gift. I do disagree that when a will is renounced it is void for all purposes, thus possibly reinstating an earlier will which the testator clearly had the intent to revoke. The law, as interpreted in this case, provides no certainty that a will previously made is ever revoked.
¶ 60. In addition to my dissent regarding the interpretation of Broadus, I also must dissent to the finding that the will was not properly executed. Sufficient facts are not present to support the chancellor's finding of undue influence.
¶ 61. The chancellor found that, because the will was drafted at John's office while John was Michael's conservator, the will was void. The chancellor stated "that pursuant to [In re Smith], 827 So.2d 673 (Miss.2002), that the Last Will and Testament of Clyde Woodfield, dated September 26, 2001, is void due to a breach of confidential relationship and a breach of fiduciary duty of John V. Woodfield."
¶ 62. The finding of undue influence was erroneous because In re Smith does not apply to this case. In Smith, the will was invalidated because the attorney preparing the will received a bequest from the testator, raising a presumption of undue influence. Id. at 678 (¶ 4). In this case, John did not prepare the will nor was he present when the will was signed. The 2001 will was prepared at John's office by John's paralegal on September 26. Danny Leggett, a family friend and witness to the will, testified that he, Clyde and John's paralegal were the only ones present at the office when the will was executed. From the testimony presented to the trial court, John had nothing to do with the procurement of the 2001 will. It must also be noted that Clyde Woodfield, a former businessman and state senator, was not an uneducated or uninformed person, nor is it illogical that he would utilize his son's law office to have his will typed.
¶ 63. Because John was not involved in creating the will the presumption of undue influence derived from In re Smith does not apply, as that case addresses the fiduciary duty between the attorney drafting the will and the testator. Whether the actions of John's office assistant resulted in a breach of fiduciary duty to Michael has not been fully developed in the record or the court's ruling. Regardless of the existence of such a breach, the chancellor's *492 conclusion that the breach occurred is not supported by In re Smith, and I conclude that it was error to find such.
MYERS, P.J., AND BARNES, J., JOIN THIS OPINION.
NOTES
[1] The motion for rehearing is granted. The earlier opinion is withdrawn. This opinion's writer did not participate in the initial decision, as he had just returned from a leave of absence. Having been on the court when the original decision was presented and not being disqualified or recused, the writing judge is eligible to participate in resolution of the motion. Cf. Dillard v. Musgrove, 838 So.2d 261, 266-67 (Miss.2003) (Waller, J., concurring.)